

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS



# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

*Barbara J. Houser*

**United States Bankruptcy Judge**

**Signed November 28, 2012**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| **SUPERIOR AIR PARTS, INC.** | § | **CASE NO. 08-36705-BJH-11** |
| Debtor. | § | |
| | § | |
| **LYCOMING ENGINES, A Division of** | § | |
| **Avco Corp., and TEXTRON** | § | |
| **INNOVATIONS, INC.,** | § | |
| Plaintiff, | § | **ADV. PRO. NO. 12-3035-BJH** |
| | § | |
| - against - | § | |
| **SUPERIOR AIR PARTS, INC.,** | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Superior Air Parts, Inc. (the "Debtor" or "Superior") has moved to dismiss the second amended complaint (the "Live Complaint") filed by Lycoming Engines ("Lycoming"), a division of Avco Corporation ("Avco") and Avco's parent, Textron Innovations, Inc. ("Textron") (collectively, the "Plaintiffs") against Superior (the "Current Motion to Dismiss"). For the reasons set forth below, the Current Motion to Dismiss is granted.

Memorandum Opinion and Order

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The following factual background appears in the Live Complaint, and appears to be undisputed, except where specifically noted. Superior manufactures after-market replacement parts for certain aircraft engines, including engines originally manufactured by Lycoming. Superior does not design its own products; it designs its own version of parts originally manufactured by others, including Lycoming. Textron holds rights to certain trade secrets and intellectual property related to Lycoming engines and licenses them to Lycoming. The Plaintiffs develop, license and own technical data, specifications, and blueprints that the Plaintiffs allege contain trade secrets not known outside Lycoming's business.

The parties to this adversary proceeding have a very long history of disputes between them. In 1976, Superior sued Lycoming in the United States District Court for the District of Kansas. Lycoming filed counterclaims against Superior in that litigation. The litigation was ultimately settled in 1981, and the parties executed a "Settlement Agreement and Release" (the "1981 Settlement"). The Live Complaint alleges that as part of the 1981 Settlement the parties signed a licensing agreement that provided that Lycoming would license to Superior its proprietary information related to certain airplane engine parts in exchange for royalty payments and Superior's agreement to keep Lycoming's information confidential and to protect it from disclosure. The 1981 Settlement contained an exhibit that detailed the part numbers for which Superior was granted a license (the "1981 Licensed Parts).

Another dispute erupted and in 1996 Avco sued Superior in the United States District Court for the Middle District of Pennsylvania[1] asserting breach of the 1981 Settlement. In 1999

---

[1] Some of the factual background recited in this Memorandum Opinion and Order is gathered from agreements entered into between the parties in 1981 and 1999. When reviewing a motion to dismiss for failure to state a claim,

the parties once again entered into a Settlement Agreement and Release and another licensing agreement and security agreement (collectively, the "1999 Agreements"). Pursuant to the 1999 Agreements, Superior obtained a perpetual license "subject to" the terms of the license with respect to eleven enumerated parts (the "1999 Licensed Parts"). The 1999 Agreements revoked all prior licenses for Lycoming data, including any licenses granted by the 1981 Settlement. The 1999 Agreements also required Superior to indemnify Lycoming against any liability resulting from any alleged defect in design of the designated parts. Superior was required to defend any suits against Lycoming at Superior's expense, and Superior was obligated to get insurance coverage for this obligation to Lycoming.

Superior filed a voluntary petition for relief under chapter 11 on December 31, 2008. Prior to its bankruptcy filing, Superior had entered into an asset purchase agreement with Avco, to be guaranteed by Textron.[2] Shortly after its bankruptcy filing, Superior filed a motion for

---

the Court is ordinarily required to consider only the complaint, and if the court is presented with matters outside the pleadings and does not exclude them, the motion must be treated as one for summary judgment. Fed. R. Civ. P. 12(d). There is a limited exception to this rule. *Kaye v. Lone Star Fund V (U.S.), LP*, 453 B.R. 645 (N.D. Tex. 2011). That is, documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to plaintiff's claims. A document is central to the plaintiff's claim when it is necessary to establish an element of one of the plaintiff's claims. *Id*. The Court concludes that the 1981 and 1999 agreements, which are attached to the Current Motion to Dismiss and are referred to in the Live Complaint, are central to the Plaintiffs' claims and thus this Court may properly consider them. In addition, the Court may consider matters of which it may take judicial notice. *Funk v. Stryker Corp.*, 631 F.3d 777 (5th Cir. 2011); *Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009). The Court may take judicial notice of documents in the public record. *R2 Invs. LDC v. Phillips*, 401 F.3d 638 (5th Cir. 2005). The Court may do so whether requested or not, at any stage of the proceedings. Fed. R. Evid. 201(c), (f). Further, the Court is permitted to take judicial notice of documents filed in the bankruptcy case. *Nute v. Pilgrim's Pride Corp.*, No. 07-0081, 2010 WL 2521724 at *1, n.4 (W.D. La. June 16, 2010); *In re American Intern. Refinery*, 402 B.R. 728 (Bankr. W.D. La. 2008); *In re James*, 300 B.R. 890 (Bankr. W.D. Tex. 2003).

[2] Superior argues in its brief that the Plaintiffs spent 2,000 hours and hundreds of thousands of dollars doing their due diligence in connection with the proposed purchase of Superior's assets, and therefore the lack of factual support for the Plaintiffs' claims is surprising. The Plaintiffs counter that it would be improper to impute knowledge gleaned during due diligence to the Plaintiffs because their due diligence was subject to a non-disclosure agreement which prohibits the Plaintiffs from using any of the information for any purpose other than their proposed purchase of Superior's assets. The Plaintiffs attach to their opposition a declaration of Michael J. Kraft which supports their version of the facts. Of course, these arguments rely upon facts well outside the pleadings, and thus the Court will not consider them in connection with the Current Motion to Dismiss.

**Memorandum Opinion and Order**

approval of bid procedures and a motion to sell substantially all of Superior's assets to Avco. In its schedules, Superior did not list the Plaintiffs as creditors; nor did Superior list the 1999 Agreements as executory contracts. As a result, Superior took no action to assume or reject the 1999 Agreements during its bankruptcy case. The deadline for filing proofs of claim in Superior's bankruptcy case was fixed at February 17, 2009 (the "Bar Date"). The Plaintiffs did not file any proofs of claim in the bankruptcy case, despite an appearance by their counsel in the bankruptcy case well before the Bar Date in connection with Superior's motion to sell. Superior later withdrew its motion to sell, citing antitrust concerns.

The Debtor's Third Amended Plan of Reorganization, filed jointly by the Debtor and the Official Committee of Unsecured Creditors (the "Plan") and which did not discuss the 1999 Agreements at all, was confirmed by Order entered on August 27, 2009 (the "Confirmation Order"). Essentially, creditors were paid, the stock of the reorganized Superior was sold to the Brantly Group, and Superior's pre-bankruptcy equity interests were cancelled. The Plan went effective on September 28, 2009. *See* Docket No. 432. After a series of claims objections and professional fee applications were determined, Superior filed its application for a final decree, which was granted on September 23, 2010, *see* Docket No. 654, and Superior's bankruptcy case was closed.

On March 14, 2012, Superior moved to reopen its bankruptcy case (the "Motion to Reopen") in order to remove a state court lawsuit filed by Lycoming and Textron against Superior in January, 2012 in the 236th Judicial District Court of Texas (the "State Court Action"). Lycoming and Textron opposed the motion, and filed a motion in the adversary proceeding seeking remand of the State Court Action (the "Remand Motion"). In addition, Superior filed a motion to dismiss the complaint under Fed. R. Civ. P. 12(b)(6), 12(b)(3), 12(e) and 9(b) (the

"Original Motion to Dismiss").[3] Essentially, Superior argued that its obligations under the 1999 Agreements were discharged when the Plan was confirmed, since the complaint sought damages on a variety of theories and declaratory relief, all premised on the assertion that Superior's perpetual license was no longer in existence due to Superior's beach of the 1999 Agreements and Plaintiffs' termination of the 1999 Agreements due to Superior's breach.

After a hearing on May 15, 2012, the Motion to Reopen was granted, and the Court ruled that removal was substantively proper because, in the Court's view, it had jurisdiction over the then-pled claims.[4] The Plaintiffs had grounded the Remand Motion principally on this Court's alleged lack of jurisdiction. However, the Plaintiffs also argued at the hearing that equitable remand was appropriate, although they had not briefed that issue or raised it in their motion. The Court ruled that it had jurisdiction over the Plaintiffs' claims, but directed the Plaintiffs to file briefing on equitable remand. Of note, also during the course of the May 15 hearing, counsel for the Plaintiffs stipulated in open court that the 1999 Agreements were not executory contracts on the date of Superior's bankruptcy filing. *Tr. hearing held 5/15/12, 9:7-22.*

With respect to the Original Motion to Dismiss, Superior argued that the Plaintiffs' claims for misappropriation of trade secrets, unfair competition, theft and conversion were all barred by the Confirmation Order, as the claims arose pre-petition but the Plaintiffs failed to file

---

[3] The adversary proceeding was removed to this Court on March 14, 2012. On March 21, 2012, Superior filed a motion to dismiss the complaint. In response, the Plaintiffs filed their first amended complaint on April 11, 2012. Superior thereafter filed the Original Motion to Dismiss on April 20, 2012. In actuality, the Original Motion to Dismiss was actually the second one filed in the adversary proceeding, since the first one had been rendered moot by the filing of the first amended complaint.

[4] In a procedural mis-step, Superior filed its notice of removal together with its Motion to Reopen. Perhaps using the adage "it is easier to beg forgiveness than ask permission," Superior did not wait until its Motion to Reopen was granted before it removed the State Court Action. The Notice of Removal was filed on March 14, 2012 and the Motion to Reopen was filed the next day. On March 21, 2012, still before the Motion to Reopen was even heard, Superior filed a motion to dismiss the complaint (which was never heard because it was rendered moot by the filing of the first amended complaint). The Plaintiffs also filed the Remand Motion on April 11, 2012. The hearings on the Motion to Reopen, the Original Motion to Dismiss and the Remand Motion were all set for May 15, 2012.

a proof of claim in Superior's bankruptcy case, such that Superior's obligations under the 1999 Agreements were discharged upon confirmation of the Plan. Superior also argued that the Plaintiffs' breach of contract claim, which was founded on the assertion that Superior breached the 1999 Agreements by failing to indemnify the Plaintiffs from lawsuits filed against the Plaintiffs resulting from defective parts, was also discharged because no proof of claim had been filed. In addition, Superior argued that the claim for breach of fiduciary duty must be dismissed because the Plaintiffs had failed to allege factual content showing the existence of a fiduciary relationship between the Plaintiffs and Superior.[5]

In response, the Plaintiffs argued what the parties have come to call the "cake and eat it too" theory. The factual assumption underlying each of the Plaintiffs' claims was that the Plaintiffs properly terminated the 1999 Agreements after Superior's post-confirmation default and thus Superior's use of Lycoming's data became tortious – *i.e.*, Superior could not continue to have the benefits of the 1999 Agreements when its obligations had been discharged. Once again, the Plaintiffs had not filed any briefing with respect to its theory that even though Superior's obligations under the 1999 Agreements were discharged by confirmation of the Plan, Superior still had an obligation to perform and the Plaintiffs could terminate the 1999 Agreements upon Superior's post-confirmation default in performance, such that Superior's use thereafter of the licensed data was wrongful. The Plaintiffs asked for both the opportunity to file further briefing and for leave to amend should that briefing not persuade the Court.

At the conclusion of the May 15, 2012 hearing, the Court directed further briefing with respect to two things: (1) as noted previously, equitable remand, and (2) the issue of whether

---

[5] Superior also sought dismissal of the claims for misappropriation of trade secrets and fraudulent concealment under Fed. R. Civ. P. 9(b).

**Memorandum Opinion and Order** 6

Superior's indemnification obligation under the 1999 Agreements survived after confirmation of the Plan and, if not, is it fundamentally unfair and thus legally impermissible for Superior to retain the benefits of the perpetual license without the burdens of the indemnification and insurance clauses. On May 22, 2012, the Plaintiffs filed their supplemental briefing. On May 31, 2012 Superior filed its responsive brief, and the Court took the Original Motion to Dismiss and the Remand Motion under advisement.

Ironically, Plaintiffs' counsel failed to brief either of the issues the Court directed be briefed. Rather, the only legal argument set forth in the Plaintiffs' supplemental brief was the assertion that the 1999 Agreements were executory contracts on the petition date, were neither assumed nor rejected, and therefore "rode through" the bankruptcy case unaffected.[6] That argument, of course, was directly contrary to Plaintiffs' counsel's stipulation in open court at the May 15 hearing that the 1999 Agreements were not executory contracts, as Superior's counsel noted in its responsive brief.

On June 26, 2012, the Court issued its oral ruling on the Remand Motion and the Original Motion to Dismiss. The Court denied the Remand Motion both for lack of briefing and on the merits. With respect to the Original Motion to Dismiss, the Court ruled that the Plaintiffs were bound by their counsel's stipulation in open court that the 1999 Agreements were not executory contracts. The Court concluded that the "ride-through" argument advanced by the Plaintiffs did not apply to non-executory contracts like the 1999 Agreements, and the Court found inapplicable the decision of the Ninth Circuit Bankruptcy Appellate Panel in *In re JZ L.L.C.*, 371 B.R. 412 (9th Cir. BAP 2007). The Court ruled that any tort claims that arose from pre-petition actions

---

[6] The supplemental brief does argue, in one sentence and citing *In re JZ, L.L.C.*, 371 B.R. 412 (9th Cir. BAP 2007), that the ride through doctrine also applies to non-executory contracts. *Pls. Br. In Opp. To Def.'s Mot. To Dismiss and in Supp. Of Pls.' Mot. To Remand*, p. 9.

**Memorandum Opinion and Order** 7

were discharged in Superior's bankruptcy case, and that the Plaintiffs knew about Superior's bankruptcy case but had failed to file a proof of claim to protect their rights. Moreover, the Court found that the complaint failed to satisfy *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) because there was insufficient factual content pled from which the Court could plausibly infer the existence of a fiduciary relationship between Superior and the Plaintiffs. Lastly, the Court found that the complaint failed to satisfy the particularity requirements of Fed. R. Civ. P. 9(b). *Tr. hearing held* 6/26/12, 10:6-11:26. The Court gave the Plaintiffs one last opportunity to cure pleading deficiencies through amendment and ruled that the complaint would be dismissed if a further amended complaint was not on file by July 11, 2012.[7]

On July 11, 2012, the Plaintiffs filed the Live Complaint. In very broad brush, the Live Complaint alleges that (i) Superior got the knowledge to make its parts by illicitly obtaining the trade secrets by, among other things, improperly using licensed data to create non-licensed products and improperly getting information from Lycoming's vendors, (ii) Superior knew its actions were improper because it undertook to protect Lycoming's trade secrets in both the 1981 Settlement and the 1999 Agreements, and the sort of data that Superior obtained is considered to be trade secrets by the industry, (iii) "upon information and belief," Superior could not have properly reverse engineered the designs and specifications because Superior lacks independent engineering capabilities, (iv) Superior improperly used Lycoming's trade secrets to obtain parts

---

[7] The Court stated:

> I will allow an attempt to replead. But from my perspective, this will be the last time. So, either you get it right this time – you've re-pled once after the lawsuit was removed, and you did that of right. You had the right under the rules, once the motion to dismiss was filed, to replead, and you took that opportunity. So, this will be the second amended complaint. So, from my perspective, this is it.

*Tr. hearing held* 6/26/12, 14:11-18.

manufacturing approvals ("PMAs") from the Federal Aviation Administration ("FAA"), (v) Superior refused to indemnify Lycoming as required by the 1999 Agreements after Lycoming was sued post-confirmation for failure of a part that had been licensed to Superior, and (vi) as a result, Lycoming filed the State Court Action on January 13, 2012 alleging claims for indemnity and for various torts related to specific parts manufactured by Superior.

The Live Complaint attaches as an exhibit an 80+ page list of part numbers. The parts on this list, excluding the 1999 Licensed Parts, will be referred to herein as the "At Issue Parts." The Live Complaint alleges that Superior has requested PMAs for some of them, and is selling them currently, and the Live Complaint therefore seeks relief with respect to both the 1999 Licensed Parts and the At-Issue Parts. The Live Complaint also alleges that Superior "has exported or will export" some of the data related to the 1999 Licensed Parts and/or the At-Issue Parts to China.

Accordingly, the Live Complaint asserts claims for (1) misappropriation of trade secrets as to both the 1999 Licensed Parts and the At Issue Parts;[8] (2) a declaratory judgment that Superior has no license or other rights to Lycoming's confidential information as a result of any license agreement and is therefore prohibited from the manufacture, distribution or sale of items that incorporate Lycoming's trade secrets; (3) unfair competition as to both the 1999 Licensed Parts and the At Issue Parts, (4) breach of contract as to the 1999 Agreements by mis-using trade secrets, failing to provide insurance coverage, failing to provide a defense or indemnification against suits pending against Lycoming, and improperly transferring data to China, (5) breach of fiduciary duty as to both the 1999 Licensed Parts and the At Issue Parts, and (6) conversion as to both the 1999 Licensed Parts and the At-Issue Parts.

---

[8]As to misappropriation related to the 1999 Licensed Parts, the Plaintiffs seek damages from the time of Lycoming's termination or, in the alternative "if the 1999 agreements were discharged in bankruptcy, then . . . damages from the time of discharge to the present." *Live Compl.*, ¶ 29. As to the At Issue Parts, the Plaintiffs seek damages from discharge to present, and specifically state that they are not seeking pre-confirmation damages. *Live Compl.*, ¶ 34.

**Memorandum Opinion and Order** 9

The Live Complaint seeks damages, punitive damages, a permanent injunction, and attorneys' fees under the Texas Civil Practice and Remedies Code. It further contains allegations intended to avoid the defense of limitations, as the Live Complaint asserts that the "discovery rule" applies and the statute of limitations was tolled because Superior fraudulently concealed its wrongdoing.

The Court further notes that the Plaintiffs plead as follows:

> Damages are to be assessed from the date of Lycoming's termination of the 1999 Agreements to the present. Alternatively, damages are to be assessed from the date of the Defendant's repudiation to the present. And alternatively, damages are to be assessed from confirmation of the bankruptcy plan to the present, if Defendant is correct and the bankruptcy confirmation plan discharged those Agreements.

Live Complaint, ¶ 75.

## II.    LEGAL ANALYSIS

### A.    The Relevant Standard

The pleading standard on a motion to dismiss for failure to state a claim is well-established. A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While a complaint need not contain detailed factual allegations, it must contain "more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Erickson v. Pardus*, 551 U.S. 89, 27 S. Ct. 2197, 2200 (2007); *Jebaco Inc. v. Harrah's Operating Co. Inc.*, 587 F.3d 314, 318 (5th Cir. 2009); *McCall v. Southwest Airlines Co.*, 661 F. Supp. 2d 647, 653 (N.D. Tex. 2009). A plaintiff must allege enough facts to state a claim for relief that is "plausible" on its face. *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual

Memorandum Opinion and Order                                                                          10

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663. This plausibility standard is not a probability requirement, but does require more than mere possibility. If a complaint "pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id*. (internal quotation marks omitted). Moreover, "a court is not to strain to find inferences favorable to the plaintiff and is not to accept [as true] conclusory allegations, unwarranted deductions, or legal conclusions." *St. Paul Commodities, LLC v. DB Fleet, LLC,* No. 3:09-CV-582-L, 2009 WL 3378598, at *2 (N.D. Tex. Oct. 21, 2009) (citing *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005)).

The Supreme Court held in *Iqbal* that the "plausibility" standard articulated in *Twombly* applies in all civil cases. *Morgan v. Hubert*, 335 Fed. Appx. 466 (5th Cir. 2009) (discussing *Iqbal*). The Supreme Court has set out a two-pronged approach for reviewing a motion to dismiss for failure to state a claim. *Iqbal,* 556 U.S. at 678; *McCall*, 661 F. Supp. 2d at 653. First, the reviewing court may identify those statements in a complaint that are actually conclusions, even if presented as factual allegations. *Iqbal*, 556 U.S. at 679; *McCall*, 661 F. Supp. 2d at 653. Such conclusory statements, unlike proper factual allegations, are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 681; *McCall*, 661 F. Supp. 2d at 653. It is the conclusory nature of the statements rather than any fanciful or nonsensical nature "that disentitles them to the presumption of truth." *Iqbal*, 556 U.S. at 681; *McCall*, 661 F. Supp. 2d at 653. Second, the reviewing court presumes the truth of any remaining "well-pled factual allegations," and determines whether these factual allegations and their reasonable inferences plausibly support a claim for relief. *Iqbal*, 556 U.S. at 681; *McCall*, 661 F. Supp. 2d at 653.

### B.     As Applied Here

In the Current Motion to Dismiss, Superior argues that the Live Complaint must be dismissed for several reasons.  Initially, Superior asserts that many of the allegations in the Live Complaint are conclusory or are stated "upon information and belief" and lack any factual content.  Superior further argues that the Live Complaint fails to (i) adequately allege all of the elements of the claims for misappropriation of trade secrets, unfair competition, or conversion, (ii) allege each of those claims with particularity under Fed. R. Civ. P. 9(b), and (iii) adequately allege the existence of a fiduciary duty between the parties.  Superior further argues that the "fraudulent concealment claim" fails to satisfy Fed. R. Civ.P. 9(b), and that the Plaintiffs are improperly asserting both contract and tort claims that have been discharged by Superior's bankruptcy case.

In their brief in response to the Current Motion to Dismiss, the Plaintiffs still, incredibly, argue that the 1999 Agreements were executory contracts which "rode through" the bankruptcy case unaffected, despite their stipulation on May 15, 2012 in open court that the 1999 Agreements were not executory contracts.  Alternatively, the Plaintiffs assert that the "ride through" theory applies to non-executory contracts.  The Court previously rejected both of these arguments in its oral ruling on June 26, 2012 in connection with the Original Motion to Dismiss, and nothing in the Live Complaint alters those conclusions.

The Plaintiffs next argue that Fed. R. Civ. P. 9 does not apply to their tort claims since they do not sound in fraud, and the Live Complaint should therefore be tested only under Fed. R. Civ. P. 8.  Finally, the Plaintiffs assert that the Live Complaint states plausible claims, because the Live Complaint relies upon post-confirmation defaults as the factual predicate for its claims

and thus Superior's liability to it has not been discharged through confirmation of the Plan.

Taking the last issue first, the Court concludes that to the extent the Live Complaint relies upon post-confirmation defaults as the factual predicate for its claims, Superior's liability on those claims was not discharged through confirmation of the Plan. As noted earlier, the Court has already ruled that both sides are bound by their stipulation that the 1999 Agreements were non-executory contracts in Superior's bankruptcy case. As such, the debtor-in-possession could not assume or reject them. *In re Arts Dairy,* LLC, 417 B.R. 495 (Bankr. N.D. Ohio 2009); *In re Exide Technologies,* 378 B.R. 762 (Bankr. D. Del. 2007). The "ride through" doctrine referred to by the Plaintiffs is a term of art, referring to the third option once available for *executory* contracts, and thus it does not apply here. *In re Mirant Corp.*, 440 F.3d 238 (5th Cir. 2006). However, when a contract is non-executory, the debtor remains bound to its obligations under that contract after the bankruptcy filing. *In re Stewart Foods, Inc.*, 64 F.3d 141 (4th Cir. 1995); *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149 (3rd Cir. 1989).

Here, the Court agrees with the parties' stipulation that the 1999 Agreements were not executory. This is so because performance under the 1999 Agreements only remained due from Superior on the petition date. *In re Mirant Corp.*, 440 F.3d 238 (5th Cir. 2006); *In re Murexco Petroleum, Inc.*, 15 F.3d 60 (5th Cir. 1994). Therefore, Superior remained bound by the 1999 Agreements, and was obligated to comply with the license post-petition and post-confirmation. Confirmation of the Plan only discharged Superior from any debt "that arose before the date of such confirmation," whether or not the Plaintiffs filed a proof of claim in Superior's bankruptcy case. 11 U.S.C. § 1141(d)(1). Therefore, since Superior remained bound by the 1999 Agreements, any conduct by it post-confirmation that gave rise to a post-confirmation claim in tort or for breach of contract was not discharged by confirmation of the Plan. Conversely, any of

the Plaintiffs' claims against Superior that arose prior to confirmation of the Plan were discharged.[9]

The First Amended Complaint asserted, in essence, that Superior breached the 1999 Agreements post-confirmation, the Plaintiffs terminated the 1999 Agreements post-confirmation following Superior's breach, and Superior's continued use of the formerly-licensed data thereafter became wrongful. The factual predicate for Superior's alleged breach was its failure to indemnify the Plaintiffs with respect to lawsuits filed against the Plaintiffs post-confirmation. However, indemnification claims stand on a different footing than the other claims alleged in the First Amended Complaint, because the Court concluded when granting the Original Motion to Dismiss that the Plaintiffs' right to indemnification arose prior to the filing of Superior's bankruptcy case, and thus any indemnification claim was discharged upon confirmation of the Plan, as were any tort claims for which the necessary factual predicate was Superior's failure to indemnify the Plaintiffs. Further, because the Plaintiffs failed to file proofs of claim asserting their right to indemnification in Superior's bankruptcy case, the Court concluded when granting the Original Motion to Dismiss that the Plaintiffs were unable to recover on those claims, and were unable to recover on any tort claim for which the necessary factual predicate was Superior's failure to indemnify. Further explanation may be helpful.

The courts have developed several different tests for determining whether a future claimant has a prepetition "claim" within the meaning of the Bankruptcy Code -- *i.e.*, the "accrued state law claim" test, the "conduct" test, and the "prepetition relationship" test, which have slight variations. The most notable case adopting the "accrued state law claim" test was the

---

[9] The Plaintiffs appear to be trying to get around this result by only seeking *damages* from the date of confirmation to the present. However, if the claim upon which the Plaintiffs seek recovery arose pre-confirmation, the fact that they agree to limit their damages does not affect whether or not the claim was discharged.

**Memorandum Opinion and Order**                                                              14

Third Circuit's decision in *Avellino & Bienes v. M. Frenville Co.*, 744 F.2d 332 (3rd Cir. 1984). This approach held that a cause of action does not accrue until it accrues under state law, such that a future claimant holds no prepetition "claim" unless its right to payment has accrued under state law. The *Frenville* decision was widely criticized as embodying too narrow a view of the term "claim" under the Bankruptcy Code and the Third Circuit recently overruled the *Frenville* holding in *In re Grossman's, Inc.*, 607 F.3d 114 (3rd Cir. 2010). The "accrued state law claim" test was not adopted in the Fifth Circuit. *In re Andrews*, 239 F.3d 708, 710 n. 7 (5th Cir. 2001).

Other courts have articulated a "conduct" test, by which a bankruptcy claim arises when the debtor's conduct giving rise to the alleged liability occurred. *In re A.H. Robins Co.*, 839 F.2d 198 (4th Cir. 1988); *In re Monsour*, 372 B.R. 272 (Bankr. W.D. Va. 2007). Considered to be at the opposite end of the spectrum as the "accrued state law claim" test, this test has been criticized as being too broad, in that claimants who have had no prepetition contact with the debtor would be subject to the bankruptcy discharge before their injury occurred, thus precluding their participation in the bankruptcy case.

The "middle ground" approach, which appears to have been adopted in the Fifth Circuit, is the "pre-petition relationship" test, articulated by the court in *In re Piper Aircraft Corp.*, 162 B.R. 619 (Bankr. S.D. Fla. 1994). *See In re Wheeler*, 137 F.3d 299, 300-301 (5th Cir. 1998) (noting that the Fifth Circuit adopted the *Piper* middle ground in *Lemelle v. Universal Mfg. Corp.*, 18 F.3d 1268 (5th Cir. 1994)). Under this test, the debtor's conduct must take place pre-petition, but the future claimant must *also* have some pre-petition relationship with the debtor.

This Court aligns itself with those courts that have held that a right to indemnification is a pre-petition "claim" under the Bankruptcy Code where the indemnification agreement is executed pre-petition, even if the facts giving rise to actual liability did not occur until after the

discharge. *Colonial Sur. Co. v. Weizman*, 564 F.3d 526 (1st Cir. 2009); *In re Manville Forest Products Corp.*, 209 F.3d 125 (2nd Cir. 2000); *In re Huffy Corp.*, 424 B.R. 295 (Bankr. S.D. Ohio 2010); *In re Mobley*, 377 B.R. 406 (Bankr. M.D. Fla. 2007). Obviously, the Court will not apply the "accrued state law claim test" because it is no longer good law, even in the jurisdiction that had once applied it. Whether the Court applies the "conduct" test or the "pre-petition relationship" test is of little significance, as either test is satisfied here because the Court concludes that the relevant "conduct" is the execution of the indemnification agreement pre-petition. Further, the parties unquestionably had a pre-petition relationship with each other.

Accordingly, the Court ruled in connection with the Original Motion to Dismiss that the Plaintiffs' claims were discharged. However, as noted earlier, the Court granted leave to amend, which now gives rise to the Live Complaint and the Current Motion to Dismiss.

The Live Complaint dramatically transforms the allegations against Superior. It alleges, among other things, that (i) the "liability-inducing facts and issues occurred post-bankruptcy confirmation," *see* ¶ 2, (ii) Superior inappropriately handled Lycoming's data post-confirmation, *see* ¶ 15, (iii) Superior is continuing to make the At Issue Parts post-confirmation, *see* ¶ 17, (iv) the Plaintiffs "allege no breach of the 1999 License Agreements pre-petition or even prior to confirmation," *see* ¶ 19, and (v) Superior uses the unlicensed trade secret data post-confirmation to build and sell various parts, *see* ¶ 26, 28, 30. The Live Complaint asserts claims against Superior based both on the 1999 Licensed Parts and the At-Issue Parts.

To the extent that the Live Complaint alleges conduct that allegedly became tortious by virtue of the Plaintiffs' termination of the 1999 Agreements, the Plaintiffs are predicating their claims upon the factual assumption that their termination of the 1999 Agreements was appropriate because Superior had materially breached the 1999 Agreements by failing to

Memorandum Opinion and Order                                                        16

indemnify the Plaintiffs as required by the 1999 Agreements.  In other words, when Superior refused to indemnify Lycoming post-confirmation, the Plaintiffs argue that they properly terminated the 1999 Agreements and Superior's continued use of the licensed data post-termination gives rise to their post-confirmation claim.  The flaw in the Plaintiffs' argument remains, however, as Superior's indemnification obligation was discharged by confirmation of the Plan and therefore, the Plaintiffs had no right to terminate the 1999 Agreements. Accordingly, Superior's right to the 1999 Licensed Parts remains intact and the Plaintiffs' claims fail.

To the extent that the Live Complaint asserts post-confirmation tort claims with respect to the At-Issue Parts, or as a result of post-confirmation conduct with respect to the 1999 Licensed Parts (other than claims linked to the indemnification clause, which this Court concludes accrued pre-petition and were discharged), the Court concludes that the Live Complaint could, theoretically, state a claim that is not legally barred by confirmation of the Plan.  Nevertheless, the Court also concludes that the Live Complaint once again fails to meet the pleading standards set forth in *Iqbal* and *Twombly* as will be explained more fully below.

Superior argues that the Live Complaint impermissibly relies upon statements alleged "upon information and belief."  Allegations pled on "information and belief" should be reviewed in the same way as all factual allegations in a complaint – that is, the court should review them under *Twombly's* 12(b)(6) formulation requiring sufficient facts pled to make a claim plausible. The "mere fact that allegations begin with the statement 'on information and belief' will not automatically render them insufficient. Factual allegations made in a complaint must not be pled with absolute certainty so long as they are sufficient to make a claim plausible." *Intravisual Inc.v. Fujitsu Microelectronics America, Inc.,* No. 2:10-cv-90-TJW, 2011 WL 1004873 at *5

(E.D. Tex. Mar. 18, 2011). Conclusory allegations made upon information and belief are not entitled to a presumption of truth, *Irons v. City of Dallas*, No. 3:11-cv-1894-B, 2012 WL 1986585 (N.D. Tex. Apr. 4, 2012), and allegations stated upon information and belief that do not contain any factual support fail to meet the *Twombly* standard. *Moody v. Aqua Leisure Intern.*, No. 4:10-cv-1961, 2011 WL 2604840 (S.D. Tex. 2011); *In re Soporex, Inc.* 463 BR 344, 394 (Bankr. N.D. Tex. 2011).

Here, a review of the Live Complaint makes clear that the Plaintiffs have failed to allege sufficient facts supporting the allegations stated upon information and belief. With respect to their claim for misappropriation of trade secrets, the Plaintiffs do not allege any facts supporting their claim that Superior obtained the alleged trade secrets by improper means. The Plaintiffs do not provide any description of the "plan" Superior allegedly embarked upon, how or why the "plan" was improper, how Superior formulated and carried out the "plan," or when the "plan" was carried out. Although the Live Complaint attaches an exhibit that lists approximately 1,800 part numbers, there are no allegations linking any particular conduct to any particular part number or PMA.

In a further attempt to avoid the conclusion that their tort claims are barred by confirmation of the Plan and Superior's discharge in bankruptcy, the Plaintiffs argued for the first time at the October 18, 2012 hearing on the Current Motion to Dismiss that each time Superior uses Lycoming's data, which it may have obtained decades ago, it is a "new use" under applicable non-bankruptcy law and gives rise to a new cause of action, such that the submission to the FAA of an application for a PMA post-confirmation which uses data which Superior may have wrongfully acquired decades ago is a post-confirmation wrongful act which is not therefore

barred by the Confirmation Order.[10]   Because this was a new, un-briefed argument, the Court asked for further briefing.

In their supplemental brief, the Plaintiffs cite to several cases for the undisputed and unremarkable proposition that a bankruptcy discharge does not affect post-confirmation wrongful acts.  As noted previously, the Court agrees.  *See supra* pp. 13, 17.  With respect to the issue that the Court requested be briefed, the Plaintiffs cite a single Texas case – *Twister B.V. v. Newton Research Partners, LP*, 364 S.W.3d 428 (Tex. App. – Dallas 2012).  The Court does not believe that *Twister* is apposite here, and to the extent it is, it supports Superior's position, not Lycoming's position.

The facts in *Twister* were as follows: Newton, a Texas partnership, owned certain trade secrets in connection with natural gas processing.  Newton disclosed the trade secrets to Shell Exploration & Production Company under a promise of confidentiality.  Newton alleged that Shell shared the trade secrets with Twister, a Dutch corporation, which then allegedly used those trade secrets to market and sell products in Texas.  Newton sued Twister, which denied that it was subject to personal jurisdiction in Texas.  The court was required to determine whether Newton's cause of action against Twister arose from or was related to *Twister's* contacts with Texas.  According to the *Twister* court, whether a cause of action "arises from or relates to"

---

[10]   The Court inquired whether the Plaintiffs believed that if Superior took Lycoming's data decades ago, and submitted post-confirmation an application for a PMA containing that data, Superior's actions created a new cause of action – despite that fact that Superior may have mis-used that data before.  The Plaintiffs responded that their argument is that each use of "old" data creates a new claim, notwithstanding the fact that Texas does not recognize misappropriation of trade secrets as a continuing tort.   As to data which Superior may have acquired decades ago, the Plaintiffs argued that "they had all these other parts out there that they'd manufactured with it that were part of the settlement agreement.  That's why I'm saying that were' [sic] not going back on those parts.  That's why we're taking the position that post-bankruptcy these new uses that were not authorized are the new causes of action.  And certainly as you get up through the final termination of whatever license agreement that they had, April of 2012, that every use after that, including all the stuff they're doing today, is a basis for conversion of the data."   *Tr. hearing held 10/18/12*, 56:21 – 57:5.  The Court asked for further briefing on this argument.

conduct defines the required connection between the defendant, the litigation, and the forum. *Twister*, 364 S.W.3d at 435. Newton asserted that the trial court had jurisdiction over Twister because Twister sold products containing Newton's trade secrets in Texas. Twister argued that its marketing and sales efforts in Texas had no jurisdictional relevance because Newton's claim for misappropriation of trade secrets was unrelated to those contacts with Texas. In short, Twister argued that the basis for a claim of misappropriation is the wrongful acquisition of trade secrets, which took place in the Netherlands, not Texas. Twister also argued that if the misappropriation did not arise from the secret's acquisition, its liability was created upon the "first use" of the trade secrets, which occurred in the Netherlands.

The *Twister* court noted:

> Twister's "first use" contention is based on principles of accrual that apply to limitations defenses . . . Twister asserts that because a cause of action accrues when a wrongful act causes some legal injury, a misappropriation of trade secrets claim therefore accrues, at the latest, on the first use of the secret. Twister maintains that 'knowing when a cause of action for misappropriation of trade secrets arose' for limitations purposes means 'knowing where it arose' for jurisdictional purposes.

*Twister,* 364 S.W.3d at 438. The court then rejected that argument, stating that accrual of a cause of action for statute of limitations purposes has no implications for jurisdiction, and Twister's assertion that its marketing in Texas was irrelevant because Texas does not recognize misappropriation of trade secrets as a continuing tort was equally unavailing. The *Twister* court declined to address this issue, stating that "it goes to the merits of a statute of limitations affirmative defense . . . we are not permitted to resolve merits-based questions in our jurisdictional analysis." *Twister,* 364 S.W.3d at 439.

Lastly, the *Twister* court noted that no statute or case law in Texas has limited liability to a trade secret's first use and that if the court accepted Twister's argument, it would

**Memorandum Opinion and Order** 20

be limiting a tortfeasor's liability for misappropriation of trade secrets to the first unauthorized use and similarly eliminating personal jurisdiction for any subsequent misappropriation. . . While the first unauthorized use of a trade secret may serve as one jurisdiction fact, that use does not preclude other uses from creating other jurisdictional facts.

*Twister*, 364 S.W.3d at 439 (internal citations omitted). Therefore, the *Twister* court never addressed the merits of Twister's "first use" argument – it simply concluded that the "first use" was not the sole use relevant for jurisdictional purposes. As a result, this Court does not find the *Twister* court's analysis helpful in the context of the Current Motion to Dismiss.

Moreover, even if the Court were to conclude based on the citation to *Twister* that each "use" creates a new cause of action for misappropriation of trade secrets, the Court notes that the Live Complaint does not clearly plead the Plaintiffs' new theory. In addition, even assuming it is pled, the Live Complaint contains no factual support whatsoever for the conclusory allegation that Superior continued to "use" the alleged trade secrets post-confirmation. Rather, the Live Complaint is more akin to a formulaic recitation of the elements of a cause of action.[11]

With respect to the claim for unfair competition, the Court notes that "unfair competition" is not an independent tort under Texas law. Rather, it "is the umbrella for all statutory and non-statutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." *United States Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.,* 865 S.W.2d 214, 217 (Tex.App.-Waco 1993)(*quoting American Heritage Life Ins. Co. v. Heritage Life Ins. Co.,* 494 F.2d 3, 14 (5th Cir.1974)).

---

[11] Both parties devote substantial space in their supplemental briefs to the *merits* of the claim for misappropriation. The Plaintiffs, citing many FAA regulations and facts which are not pled in the Live Complaint, argue that the submission of supplemental PMA applications to the FAA is a new use, for a new part. *See* pp. 7-12 of *Pltfs' Supp. Br. In Opp. To Def.'s Mot. To Dismiss Second Amended Compl.* Superior also addresses the merits of this argument at length in its brief, again citing to FAA regulations and factual allegations in the brief which are not pled in its answer and which are wholly unsupported. The Court declines to address this "evidence," as it is beyond the scope of a motion to dismiss the complaint, which is directed to the face of the pleadings.

**Memorandum Opinion and Order**                                                                 21

Liability for unfair competition requires a finding of some independent substantive tort or other illegal conduct. *Hassan v. Greater Houston Transp. Co.*, 237 S.W.3d 727, 734 (Tex. App. – Houston [1 Dist.], 2007); *RTLC AG Products, Inc. v. Treatment Equip. Co.*, 195 S.W.3d 824, 832 (Tex. App – Dallas, 2006) (without some finding of an independent substantive tort or other illegal conduct, liability can't be premised on the tort of unfair competition); *Schoellkopf v. Pledger,* 778 S.W.2d 897, 904-05 (Tex.App.-Dallas 1989). The Live Complaint here presumably relies upon the trade secret misappropriation claim as the independent tort supporting liability for unfair competition. As noted earlier, the Court concludes that the trade secret misappropriation claim is insufficiently pled under *Iqbal* and *Twombly*[12] and thus no liability for unfair competition can be found either.

With respect to the claim for conversion, asserted as to both the 1999 Licensed Parts and the At-Issue Parts, the Court concludes that the Live Complaint fails to state a claim under *Iqbal* and *Twombly* because it fails to allege *any* factual support for its conclusory allegations that Superior has converted the Plaintiffs' data to its own use. For example, the Plaintiffs allege that

---

[12] The Court notes that the Plaintiffs correctly observe that the Current Motion to Dismiss does not address the Plaintiffs' second claim for relief –*i.e.*, the claim for declaratory judgment. The Court believes that while the request to dismiss the second claim for relief was not briefed, that request it is implicit in the Current Motion to Dismiss. First, the motion concludes with a request that the entire complaint be dismissed. It is not styled as a request for partial dismissal of certain claims only. Some of the grounds Superior asserts for dismissal apply equally to *all* claims – *i.e.*, the assertions that (1) the Plaintiffs improperly rely on wholly conclusory allegations, and (2) the Plaintiffs are asserting claims which have been discharged in Superior's bankruptcy. In addition, the Court believes that by its ruling that the Live Complaint fails to state a claim on all other counts, the result of any motion which specifically seeks dismissal of the declaratory judgment claim is a foregone conclusion. The Plaintiffs are requesting that this Court issue a declaration that Superior holds no rights to the Plaintiffs' trade secrets through a licensing agreement and its mirror image – that the Plaintiffs hold those rights. They also seek a declaration that Superior cannot make, distribute or sell any parts that incorporate any of the Plaintiffs' trade secrets. In other words, the second two declarations are dependent upon the first, and the Court has concluded that the Live Complaint fails to allege sufficient factual content from which the Court can infer that the Plaintiffs' breach of contract or tort claims state a claim for relief which is plausible. Without those claims, a declaration that Superior holds no rights to the Plaintiffs' trade secrets would be inappropriate, particularly in the face of what appears to be a perpetual license. Moreover, Superior's reply brief refers to the Plaintiffs' argument that Superior has not sought dismissal of the declaratory judgment claim as "erroneous." Def.'s Reply Br. In Supp. Of Mot. To Dismiss Second Amended Original Compl., pp. 8-9. It also explicitly asks that the declaratory judgment claim be dismissed. In these circumstances, the Court believes it is permissible to dismiss the declaratory judgment claim.

**Memorandum Opinion and Order** 22

Superior has "wrongfully and without authorization converted certain of Plaintiffs' proprietary and trade secret data related to the 1999 Licensed Parts to their own use post-bankruptcy confirmation, by incorporating data into their own materials and by assuming exercise of dominion and control over the original data of Plaintiffs, to the exclusion of, and inconsistent with the superior right of Plaintiffs." Live Complaint ¶ 61. There are *no* facts alleged in support of this allegation. The Plaintiffs do not describe what the trade secret data is, how Superior put that data to its own use by incorporating it into Superior's materials, when the conduct occurred, which part numbers were affected, or what materials of Superior incorporated the Plaintiffs' trade secret data. The same may be said with respect to the allegations of conversion with respect to the At-Issue Parts.

The claim for breach of fiduciary duty is also inadequately pled under *Twombly* and *Iqbal* with respect to both the 1999 Licensed Parts and the At-Issue Parts. First, with respect to the At-Issue Parts, the Live Complaint simply alleges that Superior became a fiduciary for the Plaintiffs by virtue of its covenants, obligations, and status stemming from the 1999 Agreements. The Plaintiffs' theory is apparently that because Superior agreed to keep data with respect to the eleven 1999 Licensed Parts confidential, that it was obligated to keep *all* of the Plaintiffs' data confidential simply because Superior licensed eleven parts from the Plaintiffs. The Plaintiffs further allege that Superior became a fiduciary by obtaining the Plaintiffs' data "illicitly and in contravention of its obligations stemming from contractual, moral, industry and legal standards," *see* ¶ 57, but there are no factual allegations with respect to how Superior obtained the data, when it obtained the data, what data it obtained, or how Superior's conduct violated contractual, moral, industry or legal standards. The other allegations underlying this claim are equally conclusory.

**Memorandum Opinion and Order**                                                    23

Second, with respect to the 1999 Licensed Parts, the Live Complaint alleges:

> Upon information and belief, Superior breached that fiduciary duty by improperly and unfairly using Plaintiffs' trade secrets and other proprietary data related to the 1999 Licensed Parts for business purposes in competition with Lycoming, including without limitation misusing its status as a licensee to obtain other data from third parties who properly had such data and misusing the data obtained under the license related to the 1999 Licensed Parts. Upon information and belief, Defendant also failed to advise Plaintiffs that Defendant did not affirm the 1999 Agreements in bankruptcy and failed to advise Plaintiffs of its intent to not perform on its obligations under the agreements (or common law), while continuing to misappropriate and use Plaintiffs' trade secret and proprietary data, all to Plaintiffs' detriment and damage. Upon information and belief, Defendant breached its fiduciary duty by failing to maintain adequate procedures and protections for Plaintiffs [sic] data related to the 1999 Licensed Parts, despite being under a contractual, legal, and moral obligation to do so. Upon information and belief, Defendant improperly obtained further data related to the At-Issue Parts in violation of their fiduciary duties owed to Defendants; after termination of the 1999 License Agreement, Defendant failed to cease and desist from further wrongful use of the Lycoming trade-secret and proprietary data in manufacturing and selling PMA [sic]; Defendant has failed to return all Lycoming data held by Defendant and continues use of same; Defendant has failed to properly report to the FAA the termination of its license rights as required by law; and Defendant has failed to advise Lycoming that it is in possession of other unlicensed data and its intent to wrongfully use such data.

Live Complaint, ¶ 55. There are absolutely no specific, non-conclusory factual allegations supporting this claim. Moreover, several of the alleged breaches of fiduciary duty rely for their factual predicate on the Plaintiffs' termination of the 1999 Agreements, which termination was in turn premised upon Superior's failure to indemnify the Plaintiffs post-confirmation. For the reasons noted earlier, the Court concludes that the Plaintiffs are unable to assert that claim as it is barred by Superior's bankruptcy discharge. *See supra* at pp. 13, 17.

With respect to the claim for breach of contract, asserted only as to the 1999 Licensed Parts, the Live Complaint alleges:

> Post-bankruptcy confirmation, Defendant has breached these agreements by, among other things, mis-using the trade secret and proprietary data; continuing to steal or attempt to steal Plaintiffs' trade secret and proprietary data; failing to

> provide the required insurance coverage; applying for PMAs on numerous parts; wrongfully utilizing unlicensed Lycoming trade-secret and proprietary data; failing to provide defense and indemnity for various claims, including without limitation the *Carrs* and *Lapkin* Suits; improperly transferring the data for use in foreign countries; continuing to trade in and sell parts incorporating unlicensed Lycoming data; and continuing to trade in and sell parts incorporating Lycoming data under the 1999 Agreements after termination of the license by Lycoming.

Live Complaint, ¶ 50. Once again, there are no specific, non-conclusory factual allegations supporting this claim. In addition, several of the alleged breaches relate to the Plaintiffs' termination of the 1999 Agreements, which was premised upon Superior's failure to indemnify the Plaintiffs. For the reasons stated earlier, the Court concludes that claims relating to breach of the indemnification clause have been discharged by confirmation of the Plan.

While not material to the outcome here, Superior also contends that the Live Complaint fails to allege a "fraudulent concealment" claim with the specificity required by Fed. R. Civ. P. 9(b). The Court does not read the Live Complaint as asserting any claim for relief grounded in fraudulent concealment. Rather, the Live Complaint contains allegations in support of fraudulent concealment in "avoidance of defense of limitations; discovery rule . . . ." Live Complaint, Sect. XIII. The Court does not believe, therefore, that there is any claim to dismiss.

For all of these reasons, the Court concludes that the Live Complaint fails to state any claim for relief under *Iqbal* and *Twombly* and must therefore be dismissed.

## III.    CONCLUSION

The Plaintiffs' claims, to the extent they are premised on Superior's failure to indemnify the Plaintiffs post-confirmation, are barred by confirmation of the Plan and Superior's discharge in bankruptcy. The Plaintiffs' claims, to the extent they rely as a factual predicate on Superior's failure to indemnify the Plaintiffs post-confirmation, are barred by confirmation of the Plan and

Memorandum Opinion and Order                                                                                              25

Superior's discharge in bankruptcy. To the extent that the Live Complaint asserts post-confirmation tort claims with respect to the At-Issue Parts, or as a result of post-confirmation conduct with respect to the 1999 Licensed Parts (other than claims linked to the indemnification clause, which this Court concludes accrued pre-petition and were discharged), the Court concludes that the Live Complaint could, theoretically, state a claim that is not legally barred by confirmation of the Plan and Superior's discharge in bankruptcy. Nevertheless, the Court also concludes that the Live Complaint once again fails to meet the pleading standards set forth in *Iqbal* and *Twombly* and it therefore fails to state a post-confirmation tort claim upon which relief may be granted. The claim for breach of contract also fails to meet the pleading standards set forth in *Iqbal* and *Twombly* and therefore fails to state a claim. Accordingly, the Live Complaint must be dismissed.

The Plaintiffs asked for yet another opportunity to replead. That request must be denied as the Plaintiffs received fair warning at the June 26, 2012 hearing that no further opportunities to amend would be provided beyond allowing the filing of the Live Complaint. *See supra* at p. 8, n.7.

Accordingly, the Current Motion to Dismiss is granted and the request to replead again is denied.

SO ORDERED.

### # # # END OF MEMORANDUM OPINION AND ORDER # # #